IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD W. GOODWIN,                          )
                                            )
        Plaintiff,                          )
                                            )
            vs.                             )    Civil Action No. 10-1506
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
        Defendant.                          )

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending before the Court are cross-motions for summary judgment

filed by Plaintiff Donald W. Goodwin and Defendant Michael J. Astrue,

Commissioner of Social Security.  Plaintiff seeks review of final

decisions by the Commissioner denying his claims for disability

insurance benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381

*et seq.*  For the reasons discussed below, Defendant's motion is

granted and Plaintiff's motion is denied.

**II.   BACKGROUND**

    A.   Factual Background

        Plaintiff Donald W. Goodwin was born on September 30, 1960.

(Certified    Transcript    of    Social    Security    Administration

Proceedings, Doc. No. 6, "Tr.," at 100.)  After graduating from high

school in 1978, he worked regularly for several years in the construction business. (Tr. 135, 118-121.) Mr. Goodwin was employed as a framing carpenter from at least 1987 until August 2008. This work required lifting and carrying lumber, sometimes 100 pounds or more, and hoisting the frames used in housing construction. (Tr. 130.) For a brief period between 1999 and 2001, Plaintiff attempted unsuccessfully to operate his own business, but then returned to working with his brother in the building industry. (Tr. 101, 121.)

In 2005, Mr. Goodwin underwent carpal tunnel surgery in both wrists which relieved the pain in his hands. Soon after, he began developing pain and swelling in his right elbow, increasing pain in his shoulders, hips and knees, puffiness with warmth on the back of his hands, and a number of problems with his feet. In December 2006, based on the results of a series of blood tests, Mr. Goodwin was diagnosed with rheumatoid arthritis ("RA")[1] (Tr. 223) which was initially treated with prednisone. He also developed low back pain about the same time which was attributed to two bulging discs in his

---

[1] Rheumatoid arthritis causes pain, swelling, stiffness and loss of function in the joints, most commonly in the wrists and fingers. The symptoms of the disease may fluctuate in severity and location. RA is distinct from osteoarthritis, a condition commonly associated with aging, in that it is an autoimmune disease, meaning it results from the immune system attacking the body's own issues. The cause is unknown. Treatments include medication, lifestyle changes, and surgery in an effort to slow or stop joint damage and reduce pain and swelling. *See* "Health Topics" at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus (last visited August 19, 2011), "Medline Plus."

2

lumbar spine. His back pain was exacerbated by the lifting and carrying required by his job as a carpenter. (Tr. 223.)

Mr. Goodwin later stated he had attempted to work after being diagnosed with rheumatoid arthritis, but had significant medication side effects and missed work because of doctor's appointments and treatments. (Tr. 129.) He reported he was eventually unable to continue working due to increased pain in his shoulders and arms. (Tr. 358.)

B. Procedural Background

In August 2008, Mr. Goodwin filed applications for supplemental security income and disability insurance benefits, alleging disability as of August 1, 2008, due to rheumatoid arthritis, bulging discs, inability to sleep, and side effects of his medications that caused him to "get dizzy and 'weirded out'" when exposed to sunlight. (Tr. 129.) The Social Security Administration ("SSA") denied his applications on November 6, 2008, reasoning that although he could not return to his previous work as a carpenter, there were other jobs he could perform despite his physical limitations. (Tr. 51-63.)

Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 1, 2010, before Judge Norma Cannon in Morgantown, West Virginia. Mr. Goodwin, who was represented by counsel, testified, as did an

3

impartial vocational expert ("VE"), Larry A. Bell. Judge Cannon issued her decision on April 26, 2010, again denying benefits. (Tr. 7-26.) On September 15, 2010, the Social Security Appeals Council advised Mr. Goodwin that it had chosen not to review the ALJ's decision, finding no reason under its rules to do so. (Tr. 1-3.) Therefore, the April 26, 2010 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). On November 9, 2010, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g);

4

Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986), and Sykes v. Apfel, 228 F.3d

5

259, 262 (3d Cir. 2000).

## IV. **ANALYSIS**

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[2] currently existing in the national economy.[3]   The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.   42 U.S.C. § 1382c(a)(3)(C)(I); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).   To be granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.   42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).   The Commissioner does not dispute that Mr. Goodwin satisfied the first two non-medical requirements and the parties do not object to the

---

[2]   According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities."   "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3]   A claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level.   42 U.S.C. § 1382(a).

6

ALJ's finding that Plaintiff's date last insured will be December 31, 2013. (Tr. 12.)

To determine a claimant's rights to either SSI or DIB,[4] the ALJ conducts a formal five-step evaluation:

(1)   if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[5] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to

---

[4]   The same test is used to determine disability for purposes of receiving either DIB or SSI benefits.   Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002).   Therefore, courts routinely consider case law developed under both programs.

[5]   Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations.   Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

7

present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Cannon first concluded Mr. Goodwin had not engaged in substantial gainful activity since August 1, 2008, his alleged disability onset date. (Tr. 12.) In resolving step two, the ALJ found that as of the date of the hearing, Plaintiff suffered from only two severe impairments, i.e., rheumatoid arthritis and rotator cuff syndrome. (Id.) Although she acknowledged Mr. Goodwin's complaints of bulging discs in his spine, carpal tunnel syndrome, bursitis in his shoulders, tendonitis, and kidney cysts, as well as mental impairments of "stress and depression," she concluded none of these conditions were "severe" as that term is defined by the Social Security Administration.[7] (Tr. 12-14.)

---

[6] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

[7] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." The claimant has the burden of showing that the impairment is

8

At step three, the ALJ concluded neither of Plaintiff's severe impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. That is, the rotator cuff syndrome did not satisfy the criteria of any impairment identified in Listing 1.02 (major dysfunction of a joint) and the severity of Plaintiff's rheumatoid arthritis did not satisfy the requirements of Listing 14.09 (inflammatory arthritis.) (Tr. 15.)

At step four, the ALJ concluded Plaintiff retained the residual functional capacity

> to perform light work. . .with certain modifications. He may perform occasional postural movements except [he] may perform no climbing of ladders, ropes and scaffolds; may not perform frequent overhead lifting; must avoid exposure to extremes of heat and cold and workplace hazards such as dangerous moving machinery and unprotected heights; is limited to unskilled, entry level, routine and repetitive work, primarily working with things rather than people; and may have only occasional contact with the general public.

(Tr. 15-16.)

The ALJ further noted that a functional capacity evaluation performed in March 2010 had shown Mr. Goodwin had the capacity for work at the medium exertional level. (Tr. 20, *citing* Tr. 258-361.) The ALJ concluded, however, based on the testimony of the Vocational Expert, that the postural limitations evidenced by Mr. Goodwin were more consistent with work at the light or sedentary level. (Tr.

---

severe. Yuckert, 482 U.S.at 146, n.5.

20-21.) Due to this restriction, the ALJ concluded Plaintiff could not perform his past relevant work as a carpenter which the VE described as skilled, heavy work. (Tr. 22, 46-47.) However, based on Plaintiff's age, high school education, work experience, and residual functional capacity, as well as Mr. Bell's testimony, the ALJ concluded that jobs existed in significant numbers in the economy which Plaintiff could perform despite his limitations. For example, at the unskilled light level, the VE testified that a person with Mr. Goodwin's limitations could work as an assembler or laundry folder and, at the unskilled sedentary level, as a machine tender and general sorter. (Tr. 22-23.) Thus, Plaintiff had not been under a disability between August 1, 2008, and the date of the ALJ's decision and, consequently, was not entitled to benefits. (Tr. 23.)

B. Plaintiff's Arguments

Mr. Goodwin raises seven arguments in his brief in support of the motion for summary judgment. (Doc. No. 13, "Plf.'s Brief.")

1. The ALJ erred in rejecting the unrebutted and uncontradicted findings and opinions of Plaintiff's treating source physicians, Drs. Mark G. Franz, Niveditha Mohan, and Paul Means and the opinion of the evaluating clinical psychologist, Dr. Lindsey Groves. (Plf.'s Brief at 3.)

2. The ALJ erred by not including all of Plaintiff's severe and non-severe impairments in her hypothetical question to the Vocational Expert. (Id. at 3-4, 18-19.)

3. The VE's opinion that the Plaintiff can do either light or sedentary work is not based upon substantial evidence.

10

(Plf.'s Brief at 4.)

4.  The ALJ erred by not finding Mr. Goodwin disabled at Step 3 since the evidence shows that the severity of his affective disorder, anxiety-related disorder, and rheumatoid arthritis satisfied Listings 12.04, 12.06, and 14.09, respectively. (Id. at 4, 8.)

5.  The ALJ improperly relied upon the opinion of a non-examining state agency physician whose opinion of November 3, 2008, did not incorporate all of Plaintiff's medical records. (Plf.'s Brief at 4.)

6.  The ALJ did not properly evaluate the effects of Plaintiff's rheumatoid arthritis and chronic pain in making her RFC assessment. (Id. at 4.)

7.  The ALJ erred by failing to take into consideration the fact at the time of the hearing, Mr. Goodwin was within six months of his fiftieth birthday and instead applied the age categories of the guidelines in a mechanical fashion, despite Mr. Goodwin's borderline situation. (Plf.'s Brief at 19.)

Before addressing Plaintiff's arguments, we summarize the medical evidence of record. We have omitted discussion of those conditions which did not, according to the medical evidence or Plaintiff's testimony and self-reports, cause any limitations on his ability to perform substantial gainful activity. [8] Also, the conclusions of Dr. Lindsey Groves, a consulting clinical

---

[8] These include the notes of Dr. Sarfraz Ahmad, a gastroenterologist, who treated Mr. Goodwin for a single episode of intestinal bleeding. He performed a routine colonoscopy on April 3, 2008, and removed a single sessile polyp. Dr. Ahmad recommended a follow up appointment with Dr. Means, a high fiber diet, and periodic follow-ups. (Tr. 187-204.) Nor have we discussed the report of Dr. Mohammed Zaitoon who, between May 2007 and February 2009, monitored Plaintiff's diagnoses of two small cysts on his right kidney and small hypodense mass in his left adrenal gland. (Tr. 158, 180-181, 237-239, 314-342.)

11

psychologist, are discussed in the section below addressing Plaintiff's arguments regarding his mental impairments.

C.   Medical Evidence

1.   *Dr. Paul Means:*   Although Dr. Means was identified as having been Plaintiff's primary care physician since at least June 2007 (Tr. 132), the medical record is bereft of any notes of office visits, and consists primarily of the reports from other physicians Plaintiff consulted at Dr. Means' suggestion, lab reports, and a "Physician's Report" completed in March 2010 at the request of Plaintiff's counsel.  (Tr. 180-185; 355-357.)  In this Report, Dr. Means indicated that despite treatment with methotrexate and naproxen,[9] Plaintiff had made "very limited" progress due to pain and continued to exhibit symptoms of RA.  He described Plaintiff's prognosis as "poor" and stated that his future care would include frequent lab tests and medication adjustments.  He believed Mr. Goodwin would be 100% permanently disabled, that is, he could not engage in employment "on a regular, sustained, competitive and

_____

[9] Methotrexate is an extremely potent drug used to treat a number of conditions - including rheumatoid arthritis -- that cannot be effectively controlled with other medications.  In treating RA, it is most effective when used with rest, physical therapy, and other medications.  It is in a class of drugs called antimetabolites which, in the case of RA, works by decreasing the activity of the immune system.  Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug used to relieve pain, tenderness, swelling and stiffness caused by several conditions, including rheumatoid arthritis, bursitis, and tendonitis.  *See* "Drugs and Supplements" entries at Medline Plus; *see also* Tr. 183-185.

productive basis."

2. *Dr. Mark O. Franz:* Dr. Franz, a doctor of osteopathic medicine, began treating Mr. Goodwin in January 2007. (Tr. 179.) At the time, Plaintiff was complaining of persistent pain in his back and hands. He was unable to participate in physical therapy at the time due to his work schedule. (Tr. 171; 174.) Radiographic studies done on January 12, 2007, showed normal right lateral flexion of the cervical spine with minimal loss of left lateral flexion and normal curvature of the cervical spine; the vertebral bodies were normal in height and alignment and the pedicles and processes were intact. In short, there was minimal dynamic dysfunction with loss of left lateral flexion. Tr. 177-178.)

By February 23, 2007, Dr. Franz had concluded based on blood tests that Mr. Goodwin's pain was associated with rheumatoid arthritis. (Tr. 170.) He was having difficulty with most activities of daily living, but again refused all forms of physical therapy. (Tr. 167-168.)

Because Plaintiff continued to complain of pain in his lower back, Dr. Franz sent him for an MRI of the lumbar spine. Although these test results do not appear in the medical record, Dr. Franz's notes from April 20, 2007, reflect a new diagnosis of a disc bulge at L4-L5. His bilateral hand pain, however, had improved since a change in medications. Dr. Franz again stated Mr. Goodwin would

benefit from physical therapy three times a week for four weeks for his lumbar spine and shoulder, but Plaintiff refused. (Tr. 161-165.)

In December 2008, Mr. Goodwin consulted Dr. Franz because he was having trouble sleeping (he suspected this was due to being out of medications) and needed Dr. Franz to complete a form for the Pennsylvania Department of Public Welfare which would allow him to receive Medicaid benefits. He was able to perform most activities of daily living, albeit with difficulty, and stated that the pain in his back, legs, and arms had gotten worse. (Tr. 293-298.)

In January 2009, Mr. Goodwin again complained of constant bilateral pain in his knees, shoulders and elbows. He had lost his medical insurance when he quit working the previous August and was therefore not in physical therapy. (Tr. 290-292.)

Like Dr. Means, Dr. Franz was asked to complete a Physician's Report in March 2010. He noted he had treated Mr. Goodwin for numerous complaints over the years, including swollen, stiff, sore hands, pain in his wrists, elbows and shoulders, and lower back pain. He noted there had been "no neurological deficits" identified on any examination, although there were instances of subjective pain on palpitation. Although Mr. Goodwin had been treated with numerous medications for pain, he had "refused all physical therapy." Dr. Franz declined to give a prognosis since he had not seen Mr. Goodwin

since January 9, 2009, but did state that Plaintiff would likely require medications for rheumatoid arthritis indefinitely. Dr. Franz also declined to indicate if he believed Mr. Goodwin would have any permanent disability or if he believed Plaintiff's impairments satisfied any Social Security Listing, commenting, "I cannot in good faith feel comfortable completing this [response] since patient has not been seen in over 1 year." (Tr. 285-287.)

3. *Dr. Niveditha Mohan:* By far the most extensive medical records are those of Dr. Mohan, a rheumatologist who treated Plaintiff at the UPMC Arthritis and Autoimmunity Center between August 2007 and June 2009. On August 29, 2007, Dr. Mohan recorded an extensive medical history for Mr. Goodwin in which she noted his carpel tunnel surgery in 2005[10] and a two-year history of pain and swelling in his right elbow, shoulders, hips and knees. He had puffiness with warmth on back of hands and a number of problems with his feet which were treated with steroid injections and shoe inserts. After he was diagnosed with RA in December 2006, he began treatment with prednisone which did not help his symptoms until it was increased to 10 mg. Even with this dosage, he still had about three hours of morning stiffness. Mr. Goodwin stated his low back pain had begun

---

[10]     Plaintiff later stated in a report to the SSA that that his carpal tunnel problems had returned by mid-November 2008 (Tr. 148), but the Court has been unable to pinpoint any medical evidence to support this claim.

approximately three years before and was exacerbated by mechanical stress such as lifting and carrying. (Tr. 223.) Dr. Mohan did not have access to previous lab results or x-rays which made the diagnosis of Plaintiff's underlying condition "somewhat difficult." However, a complete physical examination showed a normal range of movement in both upper and lower extremities, no synovitis to palpation, and no rheumatoid nodules. She recommended that he continue on the same drugs (prednisone, Vicodin for pain and Naprosyn), have x-rays of his hands, lumbar spine, and sacroiliac joints, and have blood tests to confirm the diagnosis of rheumatoid arthritis. (Tr. 223-226.) At a follow up appointment a few days later, Dr. Mohan confirmed the diagnosis of RA and began treatment with methotrexate. (Tr. 216-222.)

Dr. Mohan next saw Mr. Goodwin on January 2, 2008. At her direction, Plaintiff had stopped taking prednisone and was tolerating the methotrexate well except for fatigue and queasiness on the day he took it. He had not noticed any significant improvement in his diffuse pain symptoms and non-restorative sleep. His shoulder pain was worse when he used his arms for a long time and he had increased pain in his left arm because he was using it to compensate for the right. He again demonstrated a normal range of motion in his upper and lower extremities, although he experienced pain in his shoulders on abduction. Dr. Mohan concluded that his

rheumatoid arthritis appeared to be "clinically insignificant," despite the positive blood tests, and that his pains were consistent with a chronic pain syndrome such as fibromyalgia, but he did not satisfy the tender-point criteria to confirm such a diagnosis. His shoulder pain was mechanical and consistent with rotator cuff syndrome. She adjusted his medications slightly and directed him to have an MRI of his right shoulder. (Tr. 211-215.)

On July 2, 2008, Plaintiff reported a lack of significant improvement in his diffuse pain symptoms and non-restorative sleep. Although his shoulder pain was worse only when he was using his arms a lot, he had not followed-up on the recommended physical therapy and had not had the monitoring lab tests done. He did notice episodes of swelling and pain in his wrists and feet intermittently which were ameliorated by Naprosyn. He had difficulty working a four-day week because of those symptoms. Dr. Mohan adjusted his medications and warned Mr. Goodwin that if he did not have the necessary lab tests, she would be unable to prescribe methotrexate in the future; she again recommended physical therapy for his shoulder problem. (Tr. 205-210.)

Although Dr. Mohan had asked Plaintiff to return within five months, her next office notes are from a year later, in June 2009. He was complaining of increased pain in his left knee, a nodule which had developed over his left elbow, diffuse pain symptoms and poor

17

sleep. He was not taking the prescribed medications and had not had regular lab tests, perhaps due to the lack of medical insurance. His medical examination was essentially unchanged from the previous exam, except for swelling in his left knee which Dr. Mohan attributed to a sprain and treated with a steroid injection. Again, his RA was considered to be "clinically insignificant." Dr. Mohan suggested that he participate in quadriceps strengthening exercises for his knees, quit smoking because of the effects on his lungs while taking methotrexate, and follow-up in six months. (Tr. 262-267.) Unlike Drs. Means and Franz, Dr. Mohan did not provide a Physician's Report.

4. *Dr. David E. Seaman*: At Dr. Means' request, Plaintiff consulted with Dr. Seaman at the Arthritis and Rheumatology Associates of Southwestern Pennsylvania on March 31, 2009. He stated to Dr. Seaman that after being diagnosed with RA in 2007, he had been on methotrexate and naproxen but did not believe either drug was of much benefit. He complained of diffuse arthralgia or myalgia with significant fatigue, unrefreshed sleep and chronic recurrent headaches. An MRI of the right shoulder in 2007 revealed a rotator cuff tear but he refused surgery despite chronic pain.

On physical examination, Dr. Seaman noted multiple muscle tender points, but no objective synovitis throughout the joints of his hands, wrists, elbows or shoulders. Plaintiff had mild diffuse lumbar tenderness and no point tenderness in the spine. The joints

18

of his sacroiliac were non-tender and his hips had a full range of motion without pain. His knees showed minimal crepitus and his ankles and feet were not inflamed.

Dr. Seaman's assessment was of rheumatoid arthritis with "little inflammatory disease activity currently" and a suspicion that most of his current symptoms were related to fibromyalgia. (He did not, however, offer a diagnosis of fibromyalgia.) Dr. Seaman suggested that Mr. Goodwin undergo a number of blood tests through his primary care physician; have x-rays taken of his shoulders and hips; taper off methotrexate over a six-week period because "it has not been helpful and he refuses to stop drinking alcohol;"[11] continue with Naprosyn and start taking Feldene in place of methotrexate; and consult with a chronic pain clinic. Dr. Seaman noted, "There is no objective evidence to support total or permanent disability from a rheumatologic standpoint." (Tr. 331-332.)

5. *Functional capacity evaluation*: In March 2010, Dr. Means requested that Plaintiff undergo a functional capacity evaluation to determine limitations imposed by his bilateral shoulder pain, rheumatoid arthritis, cervical and lumbar spinal pain, and degenerative disc disease of the lumbar spine. (Tr.

---

[11] Among the numerous severe side effects of methotrexate is liver damage, especially when it is taken for a long time. Contemporaneous (or even previous) consumption of large amounts of alcohol while taking methotrexate may lead to liver damage. *See* "Methotrexate" entry at Medline Plus.

358-361.)    At the interview, Mr. Goodwin reported a pain level of
6 out of 10, with 10 representing the worst pain associated with his
problem since the onset.    He demonstrated frequent position changes
after sitting approximately 15 to 20 minutes.    After Plaintiff
completed a number of objective physical tests to determine his
tolerance for typical work-like activities (see Tr. 359-360), Frank
Kula, the physical therapist administering the evaluation, concluded
that he was "presently functioning in the medium work level," his
body mechanics were average, but his overall endurance and aerobic
capacity were poor.    Mr. Kula further noted that although Mr. Goodwin
appeared to be working to maximum potential and cooperated with "fair
enthusiasm," he exhibited self-limiting pain behaviors during some
tests.    The therapist found that Mr. Goodwin was a "good candidate
for a comprehensive formal physical therapy program for 4-6 weeks
to address all of the deficits [12] identified in this functional
capacity evaluation."    (Tr. 361.)

## D.    Analysis of Plaintiff's Arguments

Because Plaintiff identifies several issues which overlap
in both evidence and analysis, we have combined some arguments and

_____

[12]    The tests identified Plaintiff's major limiting factors as decreased
endurance, general deconditioning with associated posture and muscle
imbalances, decreased lifting capacity secondary to self-limiting pain
behavior, decreased upper and lower extremity range of motion, decreased
cervical and lumbar range of motion, decreased squatting, and decreased
repetitive functional material handling.    (Tr. 361.)

20

address them simultaneously.

1. *The ALJ erred by rejecting the opinions of Plaintiff's treating physicians (Franz, Mohan and Means) and relying instead on the opinion of the non-examining state agency physician.* Social Security regulations identify three categories of medical sources: treating, non-treating, and non-examining. Physicians, psychologists, and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 404.1502.

The regulations also carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 404.1527(d). In general, every medical opinion received is considered. Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the

21

treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.)  20 C.F.R. § 404.1527(d); *see also* Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all.") The opinion of a treating source is given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ erred by giving undue weight to Dr. Seaman's conclusions, by giving substantial weight to the opinion of Dr. Nghia Van Tran, a non-examining state agency physician, and by failing to give sufficient weight to the opinions of Drs. Franz, Mohan, and Means who concluded, according to Plaintiff, that he cannot perform even sedentary work.  In particular, the ALJ rejected the opinions of his treating physicians without adequate explanation.  (Plf.'s Brief at 16.)  A review of the medical

evidence shows Plaintiff's argument on this point is unavailing.

First, with regard to the opinions of Plaintiff's treating physicians, the evidence shows that Dr. Mohan repeatedly stated that Plaintiff had full range of motion in all major joints and that his RA was "clinically insignificant" and well-controlled with medication (although he did continue to have pain.) She expressed no opinion regarding his ability to work. Dr. Franz opined that between December 2008 and November 2009, Plaintiff would be temporarily disabled due to his RA, but he later declined to give any opinion about long-term disability or the degree of impairment. Dr. Franz and Dr. Mohan noted that Plaintiff refused to participate in physical therapy, was sometimes lax about having timely laboratory tests, and failed to stop smoking and drinking alcohol as recommended. In sum, the opinions of Drs. Franz and Mohan do not support Plaintiff's argument that they considered him incapable of light or sedentary work.

As for Dr. Means' opinion that Plaintiff was 100% disabled, the ALJ pointed out that this statement was not "supported by the overall medical evidence of record." (Tr. 21.) It is well-established that an ALJ may reject a treating physician's opinion which is brief and conclusory with little in the way of clinical findings to support it, providing he adequately explains the basis for the rejection. Mason, 994 F.2d at 1067; Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.

1994) ("The Secretary may properly accept some parts of the medical evidence and reject other parts, but [he] must consider all the evidence and give some reason for discounting the evidence [he] rejects.")  Moreover, to the extent Dr. Means did conclude that Plaintiff would be totally disabled or perform any type of work, such opinions are not entitled to special significance because they are non-medical opinions on a subject reserved for the Commissioner.  20 C.F.R. § 404.1527(e); *see also* Social Security Ruling ("SSR")[13] 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner," and Smith v. Comm'r of Social Sec., No. 05-3533, 2006 U.S. App. LEXIS 10896, *15 (3d Cir. May 1, 2006).  While such opinions, even from a treating source, are not to be ignored, they are not entitled to controlling weight.  Summerville v. Astrue, CA No. 07-842, 2008 U.S. Dist. LEXIS 38412, *30-*31 (W.D. Pa. May 8, 2008).

Similarly, although Plaintiff argues that Dr. Seaman's opinion is entitled to less weight because he was only a one-time consulting physician, we conclude the ALJ did not err in giving "great weight"

---

[13] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006).  "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."  Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

24

to his statement that there was no objective evidence from a rhematologic standpoint that Plaintiff was totally or permanently disabled. The ALJ specifically stated the reason she arrived at this conclusion, namely that the opinion came from an examining specialist in rheumatology. (Tr. 19.) *See* 20 C.F.R. § 404.1527(d)(4) (more weight given to the opinions of specialist than to generalist treating sources.)

Mr. Goodwin is correct that Dr. Tran completed his evaluation in November 2008, based on Plaintiff's medical file at that time, some 17 months before the hearing and the ALJ's decision. (Tr. 240-246.) In his evaluation, Dr. Tran concluded Plaintiff could occasionally lift and carry up to 20 pounds, and frequently lift and carry up to ten pounds; could stand and/or walk for about six hours in an 8-hour workday; could sit (with normal breaks) for the same time period; and had unlimited ability to use hand and foot controls to push or pull. All postural functions[14] could be performed on an occasional basis, meaning from very seldom to up to one-third of an 8-hour workday. Plaintiff had no limitations in using his hands, no visual or communications limitations, and no environmental limitations. In the narrative portion of his report, Dr. Tran summarized the findings from Dr. Mohan's examination on July 2, 2008,

---

[14] Postural functions include climbing ramps, stairs, ladders, ropes or scaffolds, balancing, stooping, kneeling, crouching or crawling. (Tr. 242.)

and concluded that Plaintiff's diagnosed rheumatoid arthritis was stable and well controlled with treatment. On the other hand, Mr. Goodwin had described "significantly limited" daily activities, a statement Dr. Tran found to be only partially consistent with the limitations indicated by other evidence in the case file.

Plaintiff is incorrect, however, in arguing that the ALJ relied solely on Dr. Tran's opinion or erred by giving it substantial weight in reaching her conclusion as to his RFC.[15] (Plf.'s Brief at 16.) Based on Dr. Tran's opinion, Plaintiff was capable of light work with only occasional postural limitations and no manipulative or environmental limitations. The ALJ, however, relying on the entire record, including the Vocational Expert's testimony and that of Plaintiff himself, concluded Mr. Goodwin had additional restrictions which prevented him from working on ladders, ropes or scaffolds, performing overhead lifting due to his rotator cuff problem, and being exposed to extremes of heat, cold and workplace hazards. In short, the ALJ incorporated in her RFC description several limitations Dr. Tran had not considered and did not adopt his conclusions without reservation.

Moreover, as the ALJ explicitly noted in her decision (Tr. 20),

---

[15] The ALJ explained that she gave Dr. Tran's assessment substantial weight because it "well-reasoned, supported by and consistent with the longitudinal medical evidence of record, and made by a reviewing physician with an understanding of the disability programs and their evidentiary requirements." (Tr. 21.) We find no reason to dispute this explanation.

her limitation to light work was in direct contrast to a functional capacity evaluation performed just a few days before the hearing (see Tr. 358-361) in which the therapist had concluded Plaintiff could perform work at the medium exertion level, i.e., work which required the ability to lift up to 50 pounds at a time and to stand and/or walk six hours in an 8-hour workday. 20 C.F.R. § 404.1567(b). We recognize that a physical therapist such as Mr. Kula is not considered an "acceptable medical source" whose opinion is entitled to great or controlling weight. However, his opinion may provide evidence to show the severity of the alleged impairment and how it affects the claimant's ability to work. 20 C.F.R. § 404.1513(d).

Based on the ALJ's analysis of the medical record and her clear explanation of the weights she gave to each physician's opinion, we are not persuaded by Plaintiff's arguments on this point.

2. *The ALJ erred by rejecting the opinion of Plaintiff's psychologist, Dr. Lindsey Groves, and by failing to find that his depression and anxiety were sufficiently severe to satisfy Listings 12.04 and 12.06 respectively.* On March 1, 2010, Dr. Groves provided her conclusions regarding Plaintiff's mental impairments, based on a single interview with Mr. Goodwin at the request of his counsel. In a Physician's Report, Dr. Groves first summarized Plaintiff's physical impairments, and noted that he had stated during the interview that "I have a lot of stress [and] anger" when describing

27

his mental condition. After reporting that Plaintiff had never had a formal mental health diagnosis nor sought any mental health treatment, she offered the diagnoses of major depressive disorder, recurrent, moderate, and panic disorder with agoraphobia. She considered his prognosis poor unless he agreed to seek treatment for his depression; he was in "severe need" of psychotherapy and a psychiatrist for medication management. Dr. Groves concluded Mr. Goodwin was 100% totally and permanently disabled, could not engage in regular, sustained employment at the time, and met the Social Security Listings for affective disorders and anxiety related disorders. (Tr. 344-346.)

In a mental impairment questionnaire, Dr. Groves noted that her findings were based on "one initial assessment appointment" of 45 minutes duration. In addition to the mental diagnoses above, she indicated his current GAF score[16] was 55 and he evinced numerous signs

---

[16] The Global Assessment of Functioning ("GAF") scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01 587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). A GAF score between 51 and 60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social [or] occupational . . . functioning (e.g., few friends, conflicts with peers or co-workers)." See the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited August 11, 2011. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

and symptoms of mental impairments including appetite, sleep and mood disturbances, recurrent panic attacks, anhedonia, psychomotor retardation, difficulty concentrating, and feelings of guilt, worthlessness, isolation, hostility and irritability. His panic attacks occurred "a few times a week" especially when he left home or was out in public. Moreover, his mental condition exacerbated his pain and other physical symptoms. Dr. Groves concluded Mr. Goodwin's impairment had lasted or could be expected to last at least 12 months. She also estimated Plaintiff would be absent from work more than three times a month due to his impairments or treatment schedule and would not be able to work more than a few hours at a time. (Tr. 347-349.)

In the third part of her response, Dr. Groves indicated that Mr. Goodwin demonstrated marked restrictions in his activities of daily living and in maintaining social functioning, had moderate difficulties in maintain concentration, persistence or pace, and had experienced three episodes of decompensation, each of an extended duration. However, he had good ability to follow work rules, relate to co-workers, use judgment, and interact with supervisors; fair ability to deal with work stress, function independently, and maintain concentration; and poor ability to deal with the public. He had good to fair ability to understand, remember and carry out instructions and to make personal and social adjustments. (Tr.

29

344-354.)

The ALJ acknowledged Dr. Groves' opinions as summarized above.

(Tr. 13.) She then explained,

> this opinion rendered after a one-time 45 minute assessment is, by necessity, based largely on the claimant's subjective allegations. As noted above, the record contains no prior history of mental health treatment and absolutely no evidence of the three episodes of decompensation found by Dr. Groves. Similarly, the record contains no reports of weekly panic attacks as alleged by the claimant. The undersigned notes that Dr. Groves rated the claimant's Global Assessment of Functioning at 55, or moderate symptoms. . . .This finding contradicts Dr. Groves' finding of marked limitations in activities of daily living and social functioning. The undersigned gives little weight to this opinion as it is inconsistent on its face and is not supported by any other medical evidence of record.

(Tr. 13-14.)

Plaintiff argues this decision was erroneous because there is no opinion from an acceptable medical source which contradicts Dr. Groves' conclusion that his conditions satisfied Listings 12.04, 12.06, and the (D) criteria of Listing 14.09. Plaintiff further contends Judge Cannon impermissibly substituted her own opinions for those of his examining clinical psychologist and made speculative inferences from the medical evidence which were beyond the expertise of an administrative law judge. In short, the ALJ erred by rejecting his diagnoses of depression and anxiety simply because there was no prior evidence of psychiatric treatment. (Plf.'s Brief at 13-16.)

30

Taken to its logical extreme, this argument would allow a claimant to show he was disabled from any number of "newly discovered" impairments confirmed by a single acceptable medical source. However, an ALJ is permitted to reject the opinion of even a treating physician (which Dr. Groves clearly was not) where there is little objective evidence in the record to support it, *providing* she adequately explains the basis for the rejection. *See* Mason and Adorno, *supra*. Judge Cannon clearly stated the reasons for her rejection of Dr. Groves' opinions in the paragraph quoted above and the Court finds no reason to question her reasoning. Our own review of the medical record leads to the same result.

Dr. Groves stated that her conclusions and diagnoses were based in part on a review of the medical evidence. (Tr. 344.) The Court's review of the entire record reflects an almost complete absence of any evidence of mental impairments. Plaintiff did not seek disability benefits due to mental impairments, he identified no such impairments in the report of his activities of daily living or other documents submitted to the SSA, and, most importantly, there is only miniscule evidence of any concerns about his mental condition in the medical records. The notes of Drs. Franz and Means include no reference to such conditions, but Dr. Mohan's records address this issue in a minor way. Each report of an office visit with Dr. Mohan includes a brief "functional screening" questionnaire which includes

31

the question "Have you experienced any emotional difficulties that have affected your ability to complete your activities of daily living?" or "During the past 4 weeks, how much did personal or emotional problems keep you from doing your usual work, school or other daily activities?" Mr. Goodwin's responses to these questions varied from "not at all" to "somewhat," and "yes." (*See* Tr. 222, 217, 212, 296, and 266.) However, nothing in Dr. Mohan's notes reflects any concern about his mental condition during the period August 2007 through June 2009. And, as Plaintiff testified, he had not received any mental health treatment and he attributed none of his limitations to his mental conditions.

Moreover, the Court views Dr. Groves' conclusions with considerable skepticism, as did the ALJ. As a single example of her apparent unfamiliarity with the criteria for meeting either Listing 12.04 (depressive disorders) or Listing 12.06 (affective disorders), we note her conclusion that Mr. Goodwin had experienced three episodes of decompensation, each of extended duration. (Tr. 350.) Social Security regulations define "episodes of decompensation" as

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). [They] may be inferred from

32

medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

*See* Listing 12.00(C)(4).

The phrase "repeated episodes of decompensation" refers to "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Id.

As the ALJ noted, Dr. Groves provided no explanation of why she concluded Mr. Goodwin has experienced three such episodes. This significant error casts doubt on her entire report, particularly since she conceded her opinions were based on a single 45-minute interview with Mr. Goodwin.[17] More importantly, the medical record for the period 2007 through late 2009 contains nothing to support Dr. Groves' statements. As the Third Circuit Court of Appeals has indicated, the lack of medical evidence to support a plaintiff's claims is "very strong evidence" that he was not disabled. *See* Lane v. Comm'r of Soc. Sec., No. 03-3367, 2004 U.S. App. LEXIS 10948, *14

---

[17] Dr. Groves makes a number of other curious connections in her reports. For instance, after indicating Mr. Goodwin had fair to good ability to make personal and social adjustments (maintain personal appearance, behave in an emotionally stable manner, etc.), she indicated that the medical and clinical findings supporting this assessment were that Mr. Goodwin "physically cannot bend or picking [sic] things up," and he "was unable to sit or stand long [because] his limbs go numb and swell up." (Tr. 353.) The relationship between the assessment and the purported medical findings to support that assessment escapes the Court.

33

(3d Cir. June 3, 2004), *citing* Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (the Commissioner "is entitled to rely not only on what the record says, but also on what it does not say.")

We conclude the ALJ did not err in rejecting Dr. Groves' conclusions for lack of substantiating evidence in the record and by finding that Plaintiff's mental limitations did not satisfy Listing 12.04 or 12.06.

3. *The ALJ erred at Step 3 of the analysis by finding that Plaintiff's rheumatoid arthritis did not satisfy or equal the criteria of Listing 14.09.* Plaintiff argues that based on the medical evidence, including Dr. Groves' conclusions regarding his functional limitations, he satisfies the criteria of Listing 14.09(D). (Plf.'s Brief at 14.) This subsection requires documented evidence of a form of inflammatory arthritis (including rheumatoid arthritis) with

Repeated manifestations of inflammatory arthritis with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.

Listing 14.09(D).

34

Even if we were to accept Plaintiff's argument that Dr. Groves found that he had marked limitations in all three of the categories identified in Listing 14.09(D) (which we do not, as discussed in the previous section), there is no medical evidence indicating Mr. Goodwin has experienced severe fatigue, fever, malaise, or involuntary weight loss. In fact, Dr. Mohan's office notes do not mention any of these symptoms and she repeatedly commented that his rheumatoid arthritis "appears to be clinically insignificant," an opinion shared by rheumatology specialist Dr. Seaman who commented in March 2009 that there was "little inflammatory disease activity currently."

It is true Plaintiff was diagnosed and treated for rheumatoid arthritis but a diagnosis alone is not sufficient; the claimant must show that the condition is sufficiently severe that it meets *all* the criteria of a Listing to be considered presumptively disabled at Step Three. Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("To show that [an] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") Plaintiff has failed to point to evidence of severe fatigue, fever, malaise, or involuntary weight loss, the initial conditions which must be met in order to satisfy Listing 14.09(D). His motion for summary judgment based on this claim is therefore denied.

4.    *The ALJ erred by not including all of Plaintiff's*
*severe and non-severe impairments in the hypothetical question to*
*the Vocational Expert.*    At the hearing, the ALJ first asked the
Vocational Expert, Mr. Bell:

> If you take a hypothetical person of the claimant's age,
> education, background and work experience; who can do a
> range of medium work; . . . no frequent overhead lifting;
> needs to avoid hazards such as dangerous moving machinery
> and unprotected heights; should avoid extremes of heat and
> cold; no climbing of ropes, ladders, scaffolds or anything
> of that nature, could that hypothetical person perform the
> claimant's prior relevant work?

(Tr. 47.)

Mr. Bell replied that the claimant could not return to his prior
heavy work as a construction carpenter.    When occasional posture
limitations were added, the VE testified that a such a person would
be best suited for light or sedentary work.    (Id.)

The ALJ then asked:

> If you add entry-level, unskilled, routine and repetitive
> work, with things as opposed to people and no more than
> occasional contact with the general public, would that
> change the jobs that you've given me?    . . . And if
> instructions needed to be written down, would that change
> any of the jobs that you've given me?

(Tr. 48.)

The VE responded that the list of jobs he had provided would
not change with those limitations.    The ALJ followed up with
questions concerning how much time off task and many absences per
month would be tolerated by an employer of an entry level employee.

36

(Tr. 48.) Plaintiff's counsel asked if any of the identified jobs required outside work (to which the answer was no), and whether they required "a lot of concentration and attention," to which the VE responded, "You would have to pay attention to do the job." (Tr. 49.) Counsel also asked if the individual would have to function independently, to which the VE responded that he would. (Id.)

We agree with Plaintiff that the hypothetical questions posed to the vocational expert should include reference to claimant's non-severe as well as severe limitations which are supported by the medical evidence. See Chrupcala v. Heckler, 829 F.3d 1269, 1276 (3d Cir. 1987). Plaintiff does not identify in his brief the non-severe conditions which precluded him from engaging in light or sedentary work, but merely argues that the ALJ "omitted many of the Plaintiff's nonsevere impairments in her hypothetical question." (Tr. 19.) However, as the Court of Appeals has explicitly stated,

[w]e do not require an ALJ to submit to the vocational expert every impairment **alleged** by a claimant. Instead, . . .the hypotheticals posed must accurately portray the claimant's impairments and. . .the expert must be given an opportunity to evaluate those impairments as contained in the record. . . .Fairly understood, such references to **all** impairments encompass only those that are medically established. . . .And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's **credibly established limitations**.

Rutherford, 399 F.3d at 554 (internal quotations and citations omitted; emphasis in original.)

Drawing on the entire medical record, the only medical

37

conditions the Court can identify which the ALJ appears to have omitted from her hypothetical questions are Plaintiff's mild diverticulitis, kidney cysts, a small mass on his left adrenal gland, and intermittent pain in his hands, knees, and lower back, and there is no evidence these resulted in any credibly established limitations. As noted above, although Plaintiff complained his carpal tunnel syndrome had returned[18] and he had two bulging disks in his lumbar region, there is no medical evidence of recent treatment for carpal tunnel problems and the objective functional capacity evaluation performed less than a month prior to the hearing reflected no limitations on his ability to lift and carry almost 50 pounds, which is inconsistent with debilitating pain in either his hands or lower back. His inability to complete a material handling task was not due to problems with his hands or wrists but rather because he was unable to stand for a sufficient time due to increased low back and leg pain. (Tr. 361.) Finally, a careful reading of the medical record reveals no limitations imposed by Plaintiff's physicians which were not accounted for in the hypothetical questions. In fact, the ALJ incorporated several limitations which were never suggested

---

[18] Plaintiff testified that the surgery for carpal tunnel syndrome in both hands had "helped a lot" but that he now had a 50% weaker grip than in the past. (Tr. 43.) Reports to Dr. Franz about his ability to perform activities requiring the ability to grasp or perform fine motor activities such as buttoning clothes or brushing his hair (see, e.g., Tr. 163) reflect no significant impairments in this regard.

38

by any physician, e.g., avoiding moving machinery, unprotected heights, and extremes of heat and cold, or climbing, but rather came from Plaintiff's own descriptions of his limitations. (See, e.g., his testimony at Tr. 33 that "I'm afraid of an accident or something. I'm worried about myself being on a scaffold or using tools, or, or driving, even.") The question posed by Plaintiff's counsel took into account another subjective limitation, that is, Mr. Goodwin's inability to work outdoors due to adverse effects from sunlight when he is taking methotrexate (see Tr. 37, 358), but all the jobs proposed by the VE were performed indoors.

We find no reason to reverse the decision to deny benefits due to any omissions of severe or non-severe limitations from the ALJ's hypothetical questions.

5. *The VE's opinion that the Plaintiff can do alternate light and sedentary work is not based upon substantial evidence.* This argument is never developed as such in Plaintiff's brief. Plaintiff does argue that the medical reports of Drs. Means, Franz, Groves, and Mohan show he is incapable of even sedentary work. (Tr. 19.) However, Mr. Goodwin fails to point to specific evidence in the medical records which would support this argument.

According to Social Security regulations,

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very

little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or
leg controls. To be considered capable of performing a
full or wide range of light work, [the claimant] must have
the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

A person who is able to do light work is also assumed to be able
to do sedentary work unless there are limiting factors such as loss
of fine dexterity or the inability to sit for long periods of time.
SSR 83-10. The term "sedentary" describes work which requires
lifting no more than 10 pounds at a time and occasionally lifting
or carrying articles like docket files, ledgers and small tools.
Jobs are sedentary even if walking and standing are required
occasionally and other criteria are met. 20 C.F.R. § 404.1567.

The Court's review of the record discloses no comments by any
physician from which one can infer that Plaintiff cannot perform
light work with the further limitations described by the ALJ. That
is, although physicians noted at various times Plaintiff's diagnoses
of rheumatoid arthritis, carpal tunnel syndrome, and lower back pain
due to bulging disks at L-4 and L-5,[19] none of their contemporaneous

---

[19]     As the ALJ noted (see Tr. 13), there are references to bulging discs
and degenerative disc disease in the medical record (e.g., in Dr. Franz's
notes of April 20, 2007, Tr. 161-165), but there is no objective medical
evidence such as x-rays or an MRI to support this finding.

40

office notes indicate that these in any way resulted in an inability to work.

There are two exceptions to this conclusion. First, in the Physician's Report completed by Dr. Means (summarized in Section IV.C.1 above), he indicated Mr. Goodwin would be 100% permanently disabled and could not engage in employment "on a regular, sustained, competitive and productive basis." In support of his conclusions, he explicitly referred to the functional capacity evaluation which had been conducted at Keystone Rehabilitation Systems. (Tr. 355-357.) Contrary to supporting Dr. Mean's opinion that Mr. Goodwin was disabled, however, this evaluation concluded that all of Mr. Goodwin's physical limitations could significantly improve with a 4- to 6-week physical therapy program. (Tr. 361.) Moreover, the test results showed that despite those deficits, Plaintiff could still function at the medium work level. Dr. Means' conclusions in his Physician's Report are not supported by or consistent with the opinions of Plaintiff's other physicians and the objective evidence.

The second exception is an employability assessment form Dr. Franz completed for the Pennsylvania Department of Public Welfare on December 18, 2008. (Tr. 251-253.) Mr. Goodwin stated on the form that he believed he could not work because he had "severe rheumatoid arthritis and back pain from bulging disk. I need Medicare [sic] to [receive] my medicine and continue with my doctor visits for my

41

pain. I can only sleep 1 to 2 [hours] at a time because of pain at night [which] is severe." (Tr. 251.) Dr. Franz indicated Mr. Goodwin was temporarily disabled from December 18, 2008, until November 30, 2009, due to rheumatoid arthritis and that Mr. Goodwin needed medications for pain, insomnia, and a limited range of motion. This form indicates, however, that it is to be completed for an applicant "who requires medication that allows the person to be employable or continue with employment." (Tr. 253.) This would seem to imply that Dr. Franz believed that with regular medication for his conditions, Mr. Goodwin would be able to work, not that he was completely disabled.

Furthermore, no comparable form appears in the record for the period after November 30, 2009. Even if there had been such evidence of on-going disability from Dr. Franz, disability for the purpose of receiving state welfare benefits is irrelevant to the decision of the Social Security Administration. While such determinations must be taken into consideration, decisions by another government agency regarding disability are not binding on the Commissioner. *See* Halapia v. Astrue, CA No. 07-72J, 2008 U.S. Dist. LEXIS 50311, * 9 (W.D. Pa. June 30, 2008), *citing* 20 C.F.R. §§ 404.1504 and 416.904; *see also* the ALJ's decision at Tr. 18, discussing this point.

We conclude Plaintiff has failed to come forward with any evidence which would refute the VE's testimony that he is capable of performing a limited range light or sedentary work.

6. *The ALJ erred by failing to properly evaluate the effects of Plaintiff's rheumatoid arthritis and chronic pain in making her RFC assessment:* It is unclear from Plaintiff's brief exactly what he means by failing to "properly evaluate the effects" of his physical conditions. The ALJ's RFC assessment did in fact take into account Plaintiff's inability to lift and carry more than 20 pounds, eliminated numerous postural movements which would involve use of the upper right body (recognizing the effects of Plaintiff's torn rotator cuff), and required work in environments without temperature extremes. Although there was no reliable medical evidence to support Plaintiff's claims of "stress and depression," she also limited him to work which was unskilled, entry level, routine, repetitive, and with few inter-personal contacts.

As Plaintiff points out, Social Security regulations establish a two-part process for evaluating pain and other subjective symptoms. First, the ALJ must determine whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. Second, she must evaluate the intensity and persistence of the subjective symptoms and the extent to which they affect the claimant's ability to work. 20

C.F.R. § 416.929; *see also* SSR 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," requiring the ALJ to consider both the objective evidence of record and the claimant's subjective testimony.

The weight assigned to a claimant's subjective symptoms depends on the objective medical evidence in the record which could support such claims. An ALJ must "give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." Mason, 994 F.2d at 1067, *citing* Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). But when the claimant provides medical evidence supporting his complaints of pain, the "complaints should then be given great weight and may not be disregarded unless there exists contrary medical evidence." Mason, id. at 1067-1068; Witmer v. Barnhart, CA No. 01-3061, 2002 U.S. Dist. LEXIS 5559, *10-*11 (E.D. Pa. Mar. 28, 2002), *citing* Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981). Even if alleged pain is more severe or persistent than would be expected, the ALJ must consider all evidence relevant to subjective pain. Sykes, 228 F.3d at 266 n.9.

While an ALJ may reject subjective testimony if she does not find it credible, "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." Schaudeck, 181 F.3d at 433, *quoting* SSR 96-7p; *see also*

Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001) (The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear. . .the weight the adjudicator gave to the individual's statements and the reasons for that weight"), *quoting* SSR 96-7.

In considering subjective symptoms, the ALJ is directed to include factors such as the claimant's daily activities; the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication; treatment other than medication for pain relief; and any other measures the claimant uses to relieve pain or other symptoms. 20 C.F.R. § 416.929(c)(4).

Contrary to Plaintiff's argument that the ALJ did not make specific findings with regard to his subjective pain and failed to follow Social Security Ruling 96-7p in her analysis of this issue (*see* Plf.'s Brief at 16-18), we find the ALJ's discussion was comprehensive and met the requirements of the cited Ruling. She correctly stated the requirements of SSR 96-7p in her decision (Tr. 16), then went on to summarize the medications Plaintiff takes and the side effects thereof, e.g., nausea, the need to avoid sunlight, and fatigue (id.); the extent and types of pain (id.); other treatments for pain such as injections for his torn rotator cuff (id.

45

at 16-17); and the activities of daily living he could and could not perform since the onset of his alleged disability (id. at 17.) She also recognized Plaintiff's testimony on this subject and concluded that although the medical record supported the conclusion that his rheumatoid arthritis and torn rotator cuff could conceivably give rise to his allegations of pain, she found Mr. Goodwin "not entirely credible as to the nature and extent of his impairments" and consequently did not "fully accept his subjective statements concerning his symptoms and limitations." (Tr. 21.)

Although the ALJ must give "great weight" to a claimant's testimony of subjective complaints, "he has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not found credible." Weber v. Massanari, 156 F. Supp.2d 475, 485 (E.D. Pa. 2001) (internal citations omitted). "Credibility determinations are the province of the ALJ, and should only be disturbed on review if not supported by substantial evidence." Wilkes v. Massanari, CA 00-655-GMS, 2001 U.S. Dist. LEXIS 15394, *16 (D. Del. Sept. 28, 2001), *citing* Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).

We conclude Judge Cannon's analysis of Plaintiff's subjective complaints, including the effects of pain on his ability to perform light or at a minimum sedentary work with the other restrictions she identified, satisfies the criteria of Ruling 96-7p. We further

conclude that her reasoning is clearly and comprehensively explained and therefore decline to accept Plaintiff's argument that the decision should be reversed on these grounds.

      7.    *The ALJ erred by failing to take into consideration the fact that at the time of the hearing, Mr. Goodwin was within six months of his fiftieth birthday:* As noted above, Mr. Goodwin's birthday was September 30, 1960. He was therefore 47 years and 11 months old on August 1, 2008, the alleged onset date of his disability and 49 years and 6 months old on April 1, 2010, the date of the hearing. Plaintiff argues that the ALJ erred by mechanically applying the age categories of the Medical-Vocational Guidelines (informally referred to as the "grids") in determining he was not eligible for benefits. Citing Lucas v. Barnhart, No. 05-3973, 2006 U.S. App. LEXIS 14487 (3d Cir. June 12, 2006), Kane v. Heckler, 776 F.3d 1130 (3d Cir. 1985), and 20 C.F.R. §§ 404.1563(b) and 416.963(b), Plaintiff contends that in a "borderline" situation such as his, the ALJ should have taken into account the fact that he was within six months of reaching the next older category and found him disabled according to Grid Rule 201.14. (Plf.'s Brief at 19.)

Turning first to the regulations cited by Plaintiff, the grids to which Mr. Goodwin refers appear in 20 C.F.R. Part 404, Subpart P, Appendix 2. The grids provide a set of rules for determining disability based on a claimant's chronological age, education

47

(including literacy and the ability to communicate in English), and the skill-level of previous work experience (including acquisition of skills which are considered transferable to new types of work), set out in a matrix based on each level of residual functional capacity determined by the SSA, i.e., sedentary, light, and medium. "Where a claimant's qualifications correspond to the job requirements identified by a rule, the grids direct a conclusion that work exists that the claimant can perform." Sykes, 228 F.3d 262.

Social Security regulations assume, all other things being equal, that a person's age is "an increasingly limiting factor" in his ability to adjust to a new type of work, even if that work is less physically strenuous or requires fewer skills than his previous work. 20 C.F.R. §404.1563(a). Therefore, the grids describe a claimant in one of three categories based on age:

55 and over    an individual "of advanced age,"

50 through 54   an individual "approaching advanced age," and

18 through 49   a "younger" individual.[20]

20 C.F.R. § 404.1563(c)-(e).

_____

[20]  Within this category, the SSA has recognized that individuals between 45 and 49 who "(i) Are restricted to sedentary work; (ii) Are unskilled or have no transferable skills; (iii) Have no past relevant work or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English," should be considered disabled as a result of the combination of these four characteristics. Medical-Vocational Rule 200.00(h)(1). Mr. Goodwin does not meet all four criteria and therefore we do not need to consider if this exception should have been applied.

**48**

These supposed bright-line distinctions based on the claimant's age are modified by a regulation designed to address "borderline" situations. That is, where a claimant is

> within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [he is] disabled, [the SSA] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the] case.

20 C.F.R. § 404.1563(b); *see also* Lucas, 2006 U.S. App. LEXIS at *6.

"Where the guidelines do not describe a claimant's disability accurately or where there is a borderline situation, the guidelines are not to be applied 'mechanically.'" Mason, 994 F.2d at 1064, n.9. As the Third Circuit Court of Appeals has noted, although "[t]here is an assumption inherent in the grids that persons within those categories have certain capabilities,. . .in a 'borderline situation' this assumption becomes unreliable and a more individualized determination is necessary." Kane, 776 F.2d at 1133. Thus, the ALJ is required to make two factual findings. First, he must determine whether the period between one age category and another satisfies the language of 20 C.F.R. § 404.1563(b), i.e., is the claimant "within a few days to a few months of reaching an older age category." While the Circuits differ on what period of time creates a borderline situation, the Third Circuit Court of Appeals has noted that there is no authority which extends consideration of

49

the question to persons "within five (5) to six (6) months" of achieving the next category. Roberts v. Barnhart, No. 04-3647, 2005 U.S. App. LEXIS 14408, *4 (3d Cir. July 15, 2005).

Assuming the first question is answered affirmatively, the ALJ must then determine whether the claimant's ability to adjust to new work on the relevant date was more like that of an individual in the younger or in the older age category. Lucas, id. at *10, citing Kane, 776 F.2d at 1134, and Daniels v. Apfel, 154 F.3d 1129, 1136 (10th Cir. 1998) ("The Commissioner must determine based on whatever evidence is available which of the categories on either side of the borderline best describes the claimant and the Commissioner may apply that category in using the grids.")

Based on the Court's statement in Roberts that a period of five or six months before achieving the next older category does not create a borderline situation, and given the fact that the ALJ's decision was made six months before Plaintiff would have reached age 50, we conclude the ALJ did not err by failing to incorporate such an analysis in her decision. However, we further note that Plaintiff has misidentified the applicable grid. That is, because the ALJ concluded he could perform light work, Rules 202.01 through 202.22 are applicable, not the Rules pertaining to sedentary work such as 201.14, the Rule invoked by Mr. Goodwin in his brief. Thus, even if the ALJ had concluded Plaintiff's combination of education,

ability to communicate in English, previous work experience, and transferrable skills should have been considered as if he were "closely approaching advanced age," application of Rule 202.14 would still have dictated he was not disabled.

Having concluded none of Plaintiff's arguments provides a reason for this Court to reverse the ALJ's decision denying benefits or to remand for further consideration, Plaintiff's motion for summary judgment is denied and Defendant's motion is granted. An appropriate order follows.

August _30_, 2011                William L. Standish
                                 United States District Judge

51